UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,

      **Plaintiff,**

     v.

PRIMINTIVO BUENROSTO,

      **Defendant.**

Case No. 2:13-CR-154(5)
JUDGE EDMUND A. SARGUS, JR.

## OPINION AND ORDER

This matter is before the Court on Defendant Primitivo Buenrosto's Motion to Suppress Evidence. (ECF No. 69.) For the reasons set forth below, the Court **DENIES** Defendant Buenrosto's motion.

### I.

The facts giving rise to this case began when wiretaps authorized by the United States District Court for the Northern District of Ohio recorded discussions implicating Oscar Jurado, Juan Esteban Arvizu, Alexe Guerrero, and Brandon Johnson in a heroin distribution conspiracy that was allegedly importing heroin to Ohio. Special Agent Timothy Reagan of the United States Drug Enforcement Agency ("DEA") was contacted by investigators conducting the wiretaps in the Northern District of Ohio for assistance with the investigation in this jurisdiction. Special Agent Reagan is a 16-year veteran of the DEA and has received specialized training in the subject of narcotics trafficking and money laundering and has been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions.

Special Agent Reagan and other Special Agents of the DEA, members of the DEA

Columbus Drug Task Force, and local law enforcement began the investigation in December 2012 and continued it through traditional investigative means for three months.  On March 28, 2013, Reagan submitted under seal an affidavit ("Aff. 1") in support of an application for an order authorizing a wiretap of a telephone known to be possessed and used by Oscar Jurado.  Through the investigation, Reagan learned that the initial targets were low level participants in the conspiracy and, as they moved up the chain of the participants, Reagan submitted under seal three more affidavits in support of applications for orders authorizing wiretaps of telephones known to be possessed and used by Johanna Diaz, Janeth Arvizu, Santiago Manuel Azdietia, and Alonso Torres, all of whom had all been implicated in the same heroin conspiracy:  April 16, 2013 ("Aff. 2"), May, 2, 2013 ("Aff. 3"), and May 20, 2013 ("Aff. 4").  Each of these applications incorporated fully the Reagan affidavits previously submitted and each tailored the facts related to the specific individuals whom were the target of that application.

Ultimately, the investigation led to the arrest on June 9, 2013, of 14 individuals who were charged with conspiracy to possess with intent to distribute heroin.  One of those individuals, Primintivo Buenrosto, filed the Motion to Suppress Evidence that is at issue here.  (ECF No. 69.)  The government opposed that motion (ECF. No. 89), and this Court held a hearing on the motion on December 5, 2013, at which Special Agent Reagan testified.  (Suppression Hearing Transcript ("Tr.").)  The motion is now ripe for decision.

## II.

Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510 *et seq*. ("Title III") requires that an application for a wiretap order contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why

they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) (quoting 18 U.S.C. § 2518(1)(c)). "This statutory 'necessity requirement' was designed to insure that 'wiretapping is not resorted to in a situation in which traditional investigative techniques will suffice to expose the crime.'" *Id.* (quoting *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988)).

The Sixth Circuit "has clarified that the purpose of the necessity requirement 'is not to foreclose electronic surveillance until every other imaginable method has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.'" *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977)). A wiretap also does not have to be used as a last resort; Congress only "intended that the showing envisioned by § 2518(1)(c) be tested in a 'practical and common sense fashion.'" *Id.* (citation omitted). Issuing judges must ensure that "wiretaps are not being 'routinely employed as the initial step in criminal investigation.'" *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988) (quoting *Landmesser*, 553 F.2d at 20). The Sixth Circuit has summarized the requirement as follows:

> All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.

*United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985). "Because the necessity requirement is a component of Title III, and because suppression is the appropriate remedy for a violation under Title III, where a warrant application does not meet the necessity requirement, the fruits of any evidence obtained through that warrant must then be suppressed." *United States v. Rice*, 478

F.3d 704, 710 (6th Cir. 2007).  However, "[s]ince the issuing judge is in the best position to determine all of the circumstances in the light in which they may appear at that time, 'great deference' is normally paid to the determination of an issuing judge." *Alfano*, 838 F.2d at 162).

### III.

In his motion, Defendant Buenrosto moves the Court "to suppress all evidence obtained by the arresting government agents as a result of cell phone conversations between Mr. Buenrostro and Alonzo Torres (Target No. 6 Telephone 614-625-7450), as well as any other cell or telephone communications between Buenrosto and any other indicted or unindicted conspirator that were wiretapped and recorded by Government agents."  (Mot. to Suppress at 1.)  These conversations were obtained as a result of the four Title III wiretap applications submitted by Special Agent Reagan and granted by this Court.

Buenrosto challenges the sufficiency of the affidavits on two grounds.  First, he states that "the Government cannot use [the wiretap applications from the Northern District of Ohio cases] in any way to "bootstrap" Title III's necessity requirement" in the instant action.  *Id.* at 2.  Second, Buenrosto argues that the affidavits supporting the applications for the wire taps were insufficient because "each of the[] [affidavits] sets forth identical 'boilerplate' assertions that are conclusions, not facts." *Id.* at 3.

**A.  Special Agent Reagan's Affidavits and Testimony**

As to Buenrosto's second challenge, the Court finds that the affidavits are amply sufficient to meet the standards articulated above.  In each new application, Special Agent Reagan detailed the non-wiretap techniques that had been or would likely be inadequate with reference to the specific facts of this case.  Reagan also testified at the suppression hearing

4

consistent with the affidavits, which the Court finds were in no way misleading. This finding distinguishes the facts before this Court from those in *United States v. Rice*, 478 F.3d 704 (6th Cir. 2007), the case upon which Buenrosto most heavily relies.

In *Rice*, ten days after hearing a discussion on a Title III wiretap regarding what a Federal Bureau of Investigation Agent believed was a shipment of a large amount of cocaine, a district court judge granted an application for a second wiretap. Based upon evidence obtained from that wiretap, the government indicted Reginald Shantez Rice and others. Rice filed a motion to suppress the evidence obtained from the wiretap, which the district judge granted. The Sixth Circuit held that the district court did not err when it suppressed the fruits of the wiretap.

The affidavit upon which the *Rice* wiretap application relied listed, *inter alia*, the alternative investigative procedures that had been utilized up until the point at which the application was made. With regard to physical surveillance, the "Affidavit averred that '[p]hysical surveillance of the subjects of this investigation has been conducted and is presently being conducted with only limited success. Physical surveillance has identified locations and vehicles utilized by members of this organization. Physical surveillance has also corroborated information provided by the C[onfidential] S[ource].'" *Rice*, 478 F.3d at 707. The affidavit goes on to state:

> The risk of conducting long-term physical surveillance in this investigation is two-fold. As previously outlined, this organization utilizes violence and/or the threat of violence as intimidation to further their drug trafficking activities. Members of this criminal organization with known violent histories routinely carry firearms and wear bullet-resistant vests, which poses an unreasonable danger to law enforcement personnel attempting to conduct physical surveillance.

5

*Id.*

"The district court found that, based on this affidavit, an issuing judge would think that agents had conducted physical surveillance on Rice and/or his associates, and that [the agent-affiant] had information leading him to believe that 'Rice and/or his associates had used violence or threats of violence, had violent histories, carried firearms, and wore bullet-proof vests.'" *Id.* That conclusion, however, was mistaken as was revealed at the suppression hearing. Indeed, the "testimony of [the agent-affiant] at the suppression hearing revealed that government had not conducted any physical surveillance on Rice and that they had no specific information on whether Rice carried a firearm." *Id.* "The district court found that the misleading statement pertaining to physical surveillance was made recklessly." *Id.* at 708. The *Rice* court explained that while "great deference" is given to the issuing judge regarding the "validity of an electronic surveillance order," this deference does not logically apply where the issuing judge is given misleading information in the wiretap application or supporting affidavits." *Id.* at 709.

In the instant action, however, Special Agent Reagan testified at the suppression hearing consistent with the averments he made in his wiretap application affidavits. Thus, this Court, unlike the *Rice* court, was in no way misled.

The Court next addresses Buenrosto's argument that the Reagan affidavits are insufficient because of boilerplate in certain paragraphs of the affidavits. There is, however, nothing improper about setting out standardized text or uniform language in an affidavit. As Special Agent Reagan testified at the suppression hearing, the paragraphs about which Buenrosto complains were meant as a preamble of what the next factually-driven paragraphs explained. The Court here reviews the facts submitted through the Reagan affidavits and his testimony at the

6

suppression hearing.

      **1. Confidential Sources and Undercover Agents.** (Aff. 1 at ¶¶ 50–54, 62–64; Aff. 2 at ¶¶ 35–39, 47, 48; Aff. 3 at ¶¶ 29–33, 41, 42; Aff. 4 at ¶¶ 35–39, 45, 46.)

      Special Agent Reagan averred that the investigators searched the local and national "de-confliction databases" to determine if the targets were under investigation by any other law enforcement agencies. (Aff. 1 at ¶ 64.) There had been no confidential source or undercover agent that had infiltrated the group that was the target of this investigation. (Aff. 1 at ¶ 50.) On February 6, 2013 and March 5, 2013, three men were arrested whom may have information regarding Jurado, but they consistently refused to cooperate. (Aff. 1 at ¶ 50, 51.) Reagan testified that, "[e]ven if these three men eventually cooperate, based on [his] personal experience in investigating Mexican heroin trafficking organizations, these men will unlikely be able to disclose Jurado's source of supply, the methods and means of transporting the heroin to Columbus, locations used by the organization to store its heroin, and the manner in which the organization remits it's [sic] proceeds back to the ultimate source of supply in Mexico." (Aff. 1 at ¶ 52.) By the time the final affidavit was submitted, Reagan had attempted to work with two confidential sources and neither would cooperate because of personal relationships and/or fear for their safety and the safety of their families. (Aff. 4 at ¶ 35.)

      Special Agent Reagan set out in the affidavit specific conversations that had been gathered from the Northern District of Ohio wiretaps, and which indicated that the targets suspected that there was someone within their organization cooperating. (Aff. 1 at ¶ 63.) Reagan avers that he "believes that the organization is being very guarded trying to figure out if there is a confidential source or undercover agent amongst them." *Id.* at ¶ 64. This posture made

7

it too dangerous to attempt to infiltrate the organization with an undercover agent.  Reagan further avers that "due to the close and secretive nature of this organization, it is extremely unlikely that undercover agents would be able to deal with anyone in the organization above the level of a heroin purchaser." *Id.*

Reagan testified at the suppression hearing more on why it would be not only "very difficult" but also "very dangerous" for an undercover agent to infiltrate this organization.  (Tr. at 23.)  He explained that this group is very tight-knight based on lengthy and/or familial relationships.  Specifically, Jurado, Arvizu and Guerrero grew up together and all went to Westland High School; Johanna Diaz and Andy Diaz-Lopez are siblings and Jose Luis Diaz is their uncle; Alonso Torres and Luis Torres are brothers and Santiago Azdeitia is their cousin.  *Id.* at 15–16.

    **2. Physical Surveillance.**  (Aff. 1 at ¶¶ 55–59; Aff. 2 at ¶¶ 40–44; Aff. 3 at ¶¶ 34–38; Aff. 4 at ¶¶ 40–41.)

Special Agent Reagan averred that the investigators engaged in physical surveillance with only limited success.  They had learned in a one month period that Jurado had traveled from Houston, Texas to Columbus, Ohio and from Columbus to Virginia as well as Albuquerque, New Mexico and Phoenix, Arizona.  (Aff. 1 at ¶ 59.)  The investigators also observed meetings between the targets, including for example a meeting outside of the Tres Portillos Restaurant on February 27, 2013.  (Aff. 1 at ¶ 56.)  However, they had no information on the purpose of the travel or the meetings.

The affidavits articulate specific dates of surveillance attempts that were unsuccessful because, for example, the vehicle would enter "into a residential area where the vehicle did

several loops through the neighborhood where surveillance observed the vehicle pull over to the side of the road then start driving again in a manner consistent with an individual attempting to detect law enforcement surveillance." (Aff. 1 at ¶ 50.) The affidavit avers to specific surveillance efforts in Columbus, Ohio and in the Columbus suburbs of Galloway and Hilliard. (Aff. 2 at ¶¶ 41, 42.)

Special Agent Reagan explained more at the suppression hearing on the utilization of specialized surveillance techniques such as "parallel tracking," utilizing five or six vehicles at the same time an airplane is tracking the targets, all staying in constant radio contact. (Tr. at 30.) Reagan testified that even regularly using these specialized techniques, with an immense cost to the investigation, the investigators still continued to "get burned" because the targets were seasoned at evading detection. (Tr. at 17.) For example, Reagan testified about observing Azdeitia and Torres making heroin deliveries, stating:

> I mean they would stop, pull over, get out of their cars and stare up and down the street looking to see if they were being followed. They would do the deal. Then afterwards they would split up, and they'd both do heat runs, driving around in circles, blocks, doing U turns, impossible to follow. Even with five or six cars, just impossible.

(Tr. at 29–30.)

Reagan further testified that as the investigation "progressed up the chain" of individuals in the conspiracy, the physical surveillance "got harder and harder." *Id.* at 17. He stated that secrecy and covert action was of primary importance, explaining that the Northern District investigators "had spent months and months and thousands of man hours and thousands of dollars and had put a big case together, and I certainly didn't want to be the one to screw it up. So we had to be very careful in conducting surveillance and, you know, the traditional

9

investigative techniques that we used to try to figure out who Oscar was dealing with." *Id.* at 12.

      **3. Grand Jury / Interview of Witnesses.**  (Aff. 1 at ¶ 61; Aff. 2 at ¶ 46 ; Aff. 3 at ¶ 40; Aff. 4 at ¶ 44.)

Special Agent Reagan explained in the affidavits why a Grand Jury investigation or interviewing witnesses would be inadequate and dangerous to the success of the investigation. Reagan averred that after consultation with an Assistant United States Attorney, he concluded that a "Grand Jury investigation or interviews of the target subjects or their associates would not be successful in exposing the full nature and scope of the criminal activity, or the identities of all the participants." (Aff. 1 at ¶ 61; Aff. 2 at ¶ 46 ; Aff. 3 at ¶ 40 ; Aff. 4 at ¶ 44 .)  He explains that "[t]he issuance of Grand Jury subpoenas or interviews would only alert the target subjects to the investigation, causing them to become more cautious or flee to avoid further investigation or prosecution." *Id.*  At the suppression hearing, Reagan testified consistently with these affidavits. (Tr. at 13, 26–29.)

      **4. Search Warrants**. (Aff. 1 at ¶ 65; Aff. 2 at ¶ 49; Aff. 3 at ¶ 43; Aff. 4 at ¶ 47.)

Special Agent Reagan's affidavits explained why the use of search warrants would be premature and dangerous to the success of the investigation.  "One of the goals of the investigation [wa]s to determine the location of evidence, such as the location of sources of supply, locations of places where large quantities of heroin are stored and transported to Columbus, as well as ownership of assets." (Aff. 1 at ¶ 65.)  At the time the wiretaps were requested, it would have been premature to issue search warrants because they "would alert the target subjects to the existence of the investigation and would prevent the DEA and local law enforcement officers from identifying the full scope of the organization and may very well lead

to the targets of this investigation fleeing the jurisdiction." *Id.* In the later affidavits, Reagan averred to specific reasons search warrants were still premature, such as "law enforcement has not yet identified the individuals that sent Diaz and Janeth Arvizu to pick up a suspected shipment of heroin in Missouri." (Aff. 2 at ¶ 49.)

At the suppression hearing, defense counsel questioned Officer Reagan about his position that the use of search warrants was premature, when just three weeks after the last wiretap application was granted the investigators "executed six search warrants on as many residences" finding drugs in four of the residences. (Tr. at 36.) Special Agent Reagan explained that by use of the last wire intercept, ordered on May 20, 2013, they were able to confirm the location of the house at which the organization stored the heroin. *Id.* at 37. He continued that they had been able to confirm the location of the prior storage house from which the organziation was phasing out and the location of Alonso Torres' primary residence. *Id.* The investigators did not know this information at the time the wiretap applications were submitted. Once the search warrants became reasonably likely to succeed to uncover the targets of the investigation, they were utilized. *Id.*

     **5. Retrieval of Trash.** (Aff. 1 at ¶ 66; Aff. 2 at ¶ 50; Aff. 3 at ¶ 44; Aff. 4 at ¶ 48.)

In the affidavits, Special Agent Reagan set out the difficulties involved in this case in the use of the conventional technique of trash retrieval. He averred that the trash pulls at the currently known residences were ineffective because the two associated with Jurado are multi-hundred units with communal trash dumpsters (Aff. 2 at ¶ 66); Janeth Arvizu too resides in a multi-unit apartment complex on Sullivant Avenue, Columbus, with communal trash dumpsters (Aff. 3 at ¶ 50); and Prieto's two Hilliard residences are in the same type of complex with the

same communal trash options (Aff. 3 at ¶ 44). Therefore, the retrieval of trash, if possible to determine in the midst of the other trash in the dumpsters, would have to be immediate. Reagan averred that this action "would jeopardize the safety of the law enforcement agents retrieving the trash, as well as could jeopardize the investigation." (Aff. 1 at ¶ 66; Aff. 2 at ¶ 50; Aff. 3 at ¶ 44; Aff. 4 at ¶ 48.)

Special Agent Reagan also stated that, based on his "training and experience, the retrieval of trash would provide law enforcement limited information regarding the activities that are occurring in the residence, and will not lead agents to the ultimate identities and other locations utilized by individuals involved in th[is distribution of heroin] organization." *Id.* Officer Reagan testified at the suppression hearing in accord with his affidavit testimony, providing additionally that the trash retrievals had been attempted approximately every other week prior to securing the wiretaps. (Tr. at 40.)

      **6. Financial Investigation.** (Aff. 1 at ¶ 67; Aff. 2 at ¶ 51; Aff. 3 at ¶ 45; Aff. 4 at ¶ 49.)

Special Agent Reagan averred in the affidavits that he did not believe that the members of the organization are regularly using banks. He opined that in his experience, he believed that a "fully successful financial investigation is unlikely to result in the complete prosecution and dismantlement of the drug trafficking activities of Jurado and this organization, especially as it relates to currently unknown suppliers and customers." (Aff. 2 at ¶ 67.) As the investigation proceeded, the viability of a successful financial investigation did not improve. Reagan averred that they had discovered that Jurado, Diaz and Prieto were utilizing wire remitters to transfer money (Aff. 2 at ¶ 51; Aff. 3 at 45), and that Alonso and Luis Torres, Azdeitia and Diaz were "using remitters inside of Mexican markets throughout Columbus to remit money back to

12

sources of supply in Mexico." (Aff. 4 at ¶ 49).

When questioned at the suppression hearing as to why he did not check the areas in which the stores were located or subpoena records from them or the wire transfer companies, Reagan explained several reasons. First, he believed that entering a Mexican-American store with a subpoena from the DEA to gather information about one of the targets would jeopardize the case by revealing the investigation to individuals who would inform the target. (Tr. at 41–42) ("But really without the names, it's pretty difficult to go into La Machoacana with a subpoena from the DEA and say, I want to know the wire transfers that that Mexican that just came in two minutes ago did. I believe just based on my training and experience, that would blow my case."). Second, he explained that "subpoena for all wire transfers done on a specific day" would not have been useful without "knowing the names that they used," which the investigators did not know and had discovered were at times "fraudulent names." *Id.* at 42.

**7. Precise Location Data and Mobile Tracking Devices.** (Aff. 1 at ¶¶ 68, 69; Aff. 2 at ¶ 52; Aff. 3 at ¶ 46; Aff. 4 at ¶ 50.)

In the affidavits, Special Agent Reagan explained that precise location data ("pinging cellular phones") and mobile tracking device ("GPS") data had been utilized from the beginning of his investigation, but that they had been inadequate. For example, the investigators obtained permission to place a precise location monitor on Jurado's cellular telephone and a GPS on a Ford Explorer he drove. The precise location data informed the investigators that Jurado departed Columbus on February 28, 2013 on a bus to Phoenix, Arizona and that he returned to Columbus by bus on March 7, 2013 (Aff. 1 at ¶ 68); that Diaz and Janeth Arvizu traveled along Interstate 70 from Columbus toward Missouri (Aff. 2 at ¶ 52); and had alerted them from two

13

separate telephone pings to "at best within several hundred meters of a neighborhood on the west side of Columbus (Aff. 3 at ¶ 46; Aff. 4 at ¶ 50.) Reagan explains in the affidavits that "[p]recise location data had "been used to identify the general location of the target telephone," but it "does not reveal an exact location, or whether a meeting or drug transaction is actually taking place." (Aff. 2 ¶ 68.)

      **8. Mail Cover.** (Aff. 1 at ¶ 70; Aff. 2 at ¶ 53; Aff. 3 at ¶ 47; Aff. 4 at ¶ 51.)

Special Agent Reagan submitted in his affidavits that mail cover, *i.e.*, information from the outside of an envelope or parcel, would be ineffective in his investigation. He further averred that in his experience, he "had little success discovering anything of significant value using mail covers in previous drug trafficking investigations." (Aff. 1 at ¶ 70.) Reagan testified consistently with this at the suppression hearing, and further explained that in his experience it took approximately "60 days for the Postal Service to get up and running" and that he was concerned about the time. (Tr. at 44.) He also testified that the targets of his investigation utilized texts and cellular telephones to communicate, which made the mail cover less likely to reveal useful information. *Id.*

Based on the foregoing, it is clear to this Court that many traditional investigative techniques were considered and/or tried and that the wiretap applications were not the first step in this investigation. Indeed, at the suppression hearing Special Agent Reagan testified that in his career he had not ever utilized wiretaps as a first resort, and that this investigation provided him the first opportunity to request one since 2009. (Tr. at 29.) The government provided extensive explanations as to how alternative techniques were utilized or considered, but were determined to be inadequate. The government does not have the burden to show that "every other imaginable

14

method has been unsuccessfully attempted," but instead "simply to inform [this Court] of the difficulties involved in the use of conventional techniques." *Corrado*, 227 F.3d at 539. The government has met its burden.

**B. Northern District of Ohio Wiretaps**

The Court next addresses whether the wiretap affidavits from the Northern District of Ohio were utilized as the support for the instant applications – Buenrosto's first argument as to why the evidence from the wiretaps should be suppressed. It is, however, apparent from the Court's discussion *supra*, that the Court did not grant the wire tap applications in this case based only on the information gathered from the Northern District of Ohio wire tap affidavits. Each of the Reagan affidavits is sufficient to stand on its own because each provides "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," which satisfy Title III's necessity requirement. *Stewart*, 306 F.3d at 304.

**IV.**

Based on the foregoing, the Court **DENIES** Defendant Primitivo Buenrosto's Motion to Suppress Evidence. (ECF No. 69.)

**IT IS SO ORDERED.**


December 30, 2013  /s/ Edmund A. Sargus, Jr.
**DATE**  **EDMUND A. SARGUS, JR.**
  **UNITED STATES DISTRICT JUDGE**